No. 42,821

Fred A. Wilson, *Appellee*, v. St. Francis Hospital and School of Nursing, Incorporated, *Appellant*.

(373 P. 2d 180)

Opinion filed July 7, 1962.

*J. Francis Hesse*, of Wichita, argued the cause, and *Emmet A. Blaes, Roetzel Jochems, Robert G. Braden, James W. Sargent, Stanley E. Wisdom, Cecil E. Merkel, Harry L. Hobson, Bruce W. Zuercher, L. D. Klenda, Loren B. Corliss*, and *Charles M. Cline, Jr.*, all of Wichita, were with him on the briefs for the appellant.

*Lloyd M. Kagey*, of Wichita, argued the cause, and *John C. Frank, Patrick F. Kelly*, and *Keith Eales*, all of Wichita, were with him on the briefs for the appellee.

The opinion of the court was delivered by

Robb, J.: Defendant appeals from the judgment of the trial court awarding damages to plaintiff based upon the verdict of the jury, and from the trial court's orders (1) overruling defendant's demurrer to plaintiff's evidence, (2) overruling the renewal of such demurrer and motion for judgment at the conclusion of all the evidence, and (3) overruling defendant's motion for judgment on the special findings and motion for new trial.

No question is presented concerning the pleadings or the issues involved, and we shall not refer thereto except when necessary in discussion of the evidence.

The testimony of plaintiff, an employee of Beech Aircraft on January 2, 1959, showed that on that date he had ridden to work in another employee's car, and he had slipped on some ice and cut his right index finger when the car door closed on it. He worked

the remainder of the day, had two dressings applied to the finger, and at 5:00 p. m. went to the emergency room of defendant in company with his daughter who had previously injured her knee. The record does not show whether he went to the hospital to have his finger treated or only to have his daughter's knee redressed. However, X-rays were taken of plaintiff's finger and they showed no fractures but Sister Anysia, who was in charge of the emergency room, informed him he would need a tetanus antitoxin (TAT) test and she administered this test by injecting a small hypodermic needle under the skin on the inside of his forearm. Plaintiff had not previously had a TAT test and knew nothing of the process or results. The injection was administered at 6:00 p. m. and plaintiff was told it would be checked in twenty minutes. Plaintiff and his daughter informed the Sister that the daughter was doctoring with Doctor Binyon.

After the injection a welt appeared and there was burning on plaintiff's arm where the shot had been given and before 6:20 p. m. the red area had little peppery spots and was a little larger than a silver dollar. Plaintiff testified he told the Sister when the twenty minutes had expired and she told him that he would have to be patient. At 6:30 p. m. he again spoke to the Sister and received the same answer with a direction to take his daughter into the waiting room and they would call him. The burning was something terrible. About 7:00 p. m. he heard the Sister state she had not had dinner yet, and she left the emergency room apparently to obtain her dinner.

Plaintiff's arm hurt so much he could not sit there any more and he began walking the hall. At 7:30 p. m. he saw the Sister returning and told her, "This thing is absolutely setting me afire." She asked his name again but she kept on walking and he followed her. He told her he was interested in something to ease the burning and she directed him back to the emergency room but he did not know that she ever looked down at his arm. When he got to the emergency room the Sister immediately came in with a syringe and gave him a shot in the big muscle on the outside of his upper left arm. She did not tell him what the shot was for but said she would have to collect for it. He told her that when he had registered in at 5:00 p. m. he had reported he had insurance. She then told him to go home, that he would be all right and if it hurt or burned to apply cold packs or hot packs. The second injection caused a great deal of hurting but he did not know whether it was swollen or not. In

a short time his hand felt dead and numb like something had hit him "real hard." He could not make it "percolate." He applied ice packs practically throughout the night to both places because they both hurt so much and he continued to apply ice packs on both places on Saturday and Sunday. However, he was able to return to work on Monday. At times during the day on Monday he would feel nauseated and that evening he went to see Doctor Binyon for the first time. His finger was getting along in good shape. While at work on Tuesday he had a little prickly sensation on his legs and felt a little woozy once in a while. This continued Wednesday and the first aid department at the plant suggested application of ointments. Thursday little blotches came out and salt and soda baths were suggested for relief. This continued through Friday and Saturday, and on Monday he kept feeling like he was being shot with something such as a dart. Monday night he went to see Doctor Binyon who asked him if they had given him a TAT shot in the hospital. Plaintiff said he had been given a shot, but he did not know what it was called. The doctor told him he was having a violent reaction to tetanus. The doctor administered a shot in plaintiff's hip, gave him a prescription of medicine to take, and told him if he did not feel better by the next day he was to report back. By Tuesday evening plaintiff had swelling in his joints and arms, he could not shut his hands, and had difficulty in walking. He contacted Doctor Binyon who made arrangements right away to send him to Wesley Hospital in Wichita where he remained from January 13 to March 30, 1959.

The expert testimony was that there is no known test for a delayed serum sickness. The skin test is given to determine whether a patient is sensitive and likely to have immediate and serious reactions, which the medical profession terms *anaphylactic.*

Doctor Kernie W. Binyon testified that according to defendant's record plaintiff had received the TAT injection after a negative skin test; that if the skin test was negative, then defendant was not at fault in administering the TAT shot to prevent lockjaw, which is a most serious condition generally resulting in death. On the other hand, if the test was positive, and plaintiff had had a red welt and inflammation, defendant would be at fault if the TAT shot was administered. Doctor Binyon testified he did not think plaintiff had a positive reaction to the skin test and if defendant waited twenty minutes from the time the skin test was given, it would have been proper to go ahead and give the 1500 unit shot of TAT if

there was not a positive reaction such as hives. Delayed serum sickness is very rare and plaintiff's case was of such unusual character he was presented for case study to a group of doctors called the Medical Grand Rounds. Doctor Binyon did not inquire and he did not remember that plaintiff ever told him anything about the skin test. Doctor Binyon had gone to the defendant hospital and had personally obtained and read the emegency room record card which showed "TAT test @ 6 00 - 6 20 neg 1500 U given." It was from this record card that he determined the skin test had shown a negative result. He had not asked plaintiff what the results of the skin test were but had they been positive, he would not have administered the TAT shot, and finally, he testified there was and could be a correlation between the reaction shown by the sensitivity test and the resulting serum sickness.

Doctor Warren Bernstorf, another medical expert, testified the sensitivity test, consisting of a small diluted portion of horse serum, was standard procedure for the hospital. However, the more modern method is to use a diluted portion of the actual tetanus antitoxin by itself. If a patient was very sensitive, the reaction should definitely show in twenty or thirty minutes and if there was any suspicion, the time should be extended to an hour. If the sensitivity test registered positive, the immediate administration of 1500 units of TAT would probably be inviting trouble and might be disastrous. He also testified there was a direct correlation between a positive reaction on the sensitivity test and a reasonable expectation of delayed serum sickness or reaction. From the Wesley Hospital records plaintiff's reaction was a delayed secondary serum type reaction not very commonly seen and was an acute case. However, where there was possibility of tetanus infection it would definitely be negligence on the part of the physician not to give TAT even in the face of a positive reaction. The TAT could be given with precautions although some calculated risks are involved.

While the entire record kept by Wesley Hospital was admitted into evidence, only a portion is reflected in the record before us but it appears to have been kept in a meticulous manner.

Doctor Daniel C. Martin, who had been on the staff at Wesley Hospital, talked to plaintiff on January 15, 1959, after plaintiff had been given the shot of ACTH (cortisone) previously referred to by Doctor Binyon. This shot had temporarily relieved plaintiff but symptoms of burning and itching had returned although the welts had decreased. His notes showed that on January 2, 1959,

plaintiff had been given the TAT after a negative skin test. Plaintiff had told him he had not had any reddening or swelling after the test. Doctor Martin did not know whether there had been any drugs administered to plaintiff. The conversation with plaintiff took place the second day he was in Wesley Hospital.

Doctor Nicholas Romac was the intern in the emergency room at St. Francis Hospital at the time of the incident surrounding the large TAT shot administered plaintiff. His testimony was based on the card record heretofore mentioned and the procedure usually followed in the emergency room. He had no independent recollection of what actually happened in this particular case.

Doctor Leo P. Cawley, a clinical pathologist, testified that he would have to have made an actual examination and to have felt the place where the sensitivity test has been administered before giving the 1500 units of TAT. He said that plaintiff had an acute case of serum sickness. He had experienced serum sickness himself and knew it was quite painful at the time of the severe phase of the disease. He would assume a standard diluted portion of horse serum had been administered in the skin test and if the test was positive some reaction would develop. Doctor Cawley further testified that lockjaw was usually fatal and that if a skin test was positive, this would indicate a patient might have anaphylactic (or immedi- ate) reaction following the main dosage. The main dose could be given and if such an anaphylactic result developed, the physician could start controlling it with adrenalin.

Doctor Ralph Hale, who testified in behalf of defendant, is an allergy specialist and one of five doctors in the state who devote all their time exclusively to that field. He testified the reason for the skin test is to detect immediate reaction and it could not be relied on to detect delayed serum sickness because it is impossible to predict how a person is going to metabolize and handle the foreign protein over a period of several days. He stated a patient having a positive reaction would more likely have an anaphylactic shock. The next result he would be likely to have would be the accelerated delayed shock, and lastly the delayed shock which are all in the realm of probability because they can all happen but the first two would precede the delayed reaction.

The trial court instructed the jury and submitted special questions thereto. The jury returned a general verdict in favor of plaintiff in

the amount of $13,785.00 with answers to the special questions as follows:

"1. State whether you find the result of the tetanus anti-toxin sensitivity test given the plaintiff to be negative or positive. A. The evidence to determine whether the sensitivity test was positive or negative was non-conclusive.

"2. If your verdict is for the plaintiff, state what you find to have been the negligence of the defendant hospital or the intern or the nurse. A. We find the hospital negligent of not exercising reasonable care toward the patient."

The trial court stated, "I think we will ask the jury to return and make a complete answer to question No. 2."

The foreman of the jury answered:

". . . I would like to state we had considerable discussion concerning the answer to question No. 2. The only terminology we could specifically agree on was that it was paraphrased from the instructions given us. Perhaps if more deliberations are had we can arrive at specific items of negligence."

Counsel for plaintiff stated:

"I think the foreman indicated with a little more deliberations they can make that decision."

Thereafter the jury returned to the jury room and later returned with the following unanimous answers to the special questions:

"1. State whether you find the results of the tetanus anti-toxin sensitivity test given the plaintiff to have been negative or positive. A. The evidence to determine whether the sensitivity test was positive or negative was nonconclusive.

"2. If your verdict is for the plaintiff, state what you find to have been the negligence of the defendant hospital or its intern or nurse. A. We find the hospital negligent of not exercising reasonable care toward the patient in that the results of the sensitivity test were not read.

"3. If your verdict is for the plaintiff, then state what amount you allow him for:

"a) Hospital and medical expenses . . . . . . . . . . . .   . . . . . . . . . . . .$2,200.00
"b) Pain and suffering . . . . . . . . . . . . . . . . . . . .  . . . . . . . . . . $3,800.00
"c) Loss of earnings . . . . . .  . . . . . . . . . . . . . . .   . . . . . . . . . . . . . . $2,285.00
"d) Impairment of health & disability . .   . .   . . . . . . . . .  . . $5,500.00
"e) Other items, if any (specify) . . . . . . .  .   . . . . . . . . . . . . . . . . .$ —0— "

Posttrial motions for judgment based on answers to special questions and for new trial were overruled. Defendant perfected this appeal setting out seven specifications of error but the pertinent two are as follows:

1. The Court erred and abused its discretion in sending the jury back to the Jury Room for more deliberation in answering a special question.

2. The Court erred in overruling defendant's motion for judgment on the answers to the special questions because such answers

acquit the defendant of all acts of negligence which could be the proximate cause of any injuries complained of.

The special questions became those of the court when submitted to the jury and in answer to the first claimed error, we are constrained to say the trial court had the right and acted within its discretion in having those special questions answered, and upon the statements of the jury foreman, the trial court, and plaintiff's counsel, we think the jury was properly sent back to the jury room to answer the second question more fully because the words "in that the results of the sensitivity test were not read" more clearly illustrate what the jury found to be the specific negligence of the hospital.

Both parties submit the contention of defendant that in order for plaintiff to sustain his burden of proof he must show negligence of the defendant as an essential element of his malpractice action, and this negligence must be the proximate cause of the injury or, as is so often stated, in order to sustain plaintiff's burden of proof, a causal relationship must be established between defendant's negligent action and the resulting injury to the plaintiff. Defendant recognizes that its motion for judgment on the answers to the special questions notwithstanding the general verdict concedes for the purpose of such motion that the answers to the special questions are supported by the evidence. (*Banbery v. Lewis,* 173 Kan. 59, 66, 244 P. 2d 202; *Cain v. Steely,* 173 Kan. 866, Syl. ¶ 8, 252 P. 2d 909; *Sparks v. Guaranty State Bank,* 182 Kan. 165, 318 P. 2d 1062; 5 Hatcher's Kansas Digest, rev. ed., Trial, § 312, and 1961 Supp. thereto p. 65; 9 West's Kansas Digest 1, Trial, § 359 (2), and 1962 Cum. Pocket Part thereto p. 130.)

The answer to special question No. 1 denotes that from the evidence the jury was not certain whether the sensitivity test was positive or negative. That answer compels this court to hold the plaintiff failed in his burden of proving the test was positive and, therefore, the answer given by the jury must be construed as negative. (*Holt v. Bills,* 189 Kan. 14, 15, 366 P. 2d 1009; 5 Hatcher's Kansas Digest, rev. ed., Trial, §§ 310, 311; 9 West's Kansas Digest 1, Trial, § 365 (1).)

All of the medical testimony established that the accepted standards of doctors and hospitals require tetanus antitoxin to be administered wherever there is a possibility that lockjaw may result from an injury, and on that basis and where a skin test for TAT is negative, it not only was not negligence for defendant to administer the

1500 units of TAT but, as noted from the testimony of one of the experts, defendant would have been negligent in not so administering it.

The pertinent portion of G. S. 1949, 60-2918, is as follows:

"When the special finding of facts is inconsistent with the general verdict, the former controls the latter, and the court may give judgment accordingly."

In the face of the uncontradicted testimony on the part of all the experts that it was proper to administer the 1500 units of antitoxin, it was improper for the jury to make the answer it did to question No. 1 and then return the verdict it did and, following the above-quoted pertinent portion of 60-2918, and our ruling in *Holt v. Bills,* supra, we conclude the trial court erred in overruling defendant's motion for judgment *non obstante veredicto.*

Judgment reversed.

ROBB, J. (dissenting): G. S. 1949, 60-2918, would unquestionably control this case if special question No. 1 and the answer thereto were standing alone. However, in my opinion, special question No. 2 and its answer cannot be totally ignored. As a matter of fact, it is the only question asked of the jury regarding the negligence of defendant and it plainly and unambiguously states that defendant's negligence was "that the results of the sensitivity test were not read." All the medical testimony was based on the proposition that the card record kept in the emergency room of defendant showed the sensitivity test had a negative result but such testimony also had to be based on the fact that plaintiff's arm had been looked at and the results of the test read. It clearly appears the jury believed the testimony of plaintiff and did not believe that defendant's employees had either looked at or read the results of the sensitivity test on plaintiff's forearm. Plaintiff's own testimony showed that he did not know anything about tetanus antitoxin shots, skin tests, or what he should expect in the event of either a positive or negative reaction, but he did testify as to the results as they appeared to him. If the jury saw fit to believe his testimony, it also heard the testimony of the experts who explained positive and negative reactions, and concluded that the answer to special question No. 1 had to be that the evidence to determine whether the sensitivity test was positive or negative was "nonconclusive." Inherent in the answer to special question No. 2 is the charge of negligence on the part of the defendant that it *failed to look at the results of the skin test.* In my view this is equivalent to having administered no skin test

at all. Therefore, I cannot agree with defendant that the failure to read and determine the results of the sensitivity test was not negligence toward the plaintiff. In *Sparks v. Guaranty State Bank*, supra, this court in determining the answers to special questions there involved were not inconsistent with the general verdict, stated:

"This court, if possible, will give such a construction to answers to special questions as will bring them into harmony with the general verdict. Also, in considering answers to special questions to the jury, the court will not isolate one answer and place a constrained interpretation thereon, ignoring others, but will consider all of them together. If one interpretation leads to inconsistency and the other to harmony with the general verdict, the latter will be adopted. In order to sustain a motion for judgment on the findings, it is not sufficient that there be some inconsistency among the findings. They must be so contrary to the general verdict as to clearly compel the court to overthrow the verdict and render a contrary judgment as a matter of law. [Citations]." (pp. 167, 168.)

See, also, 5 Hatcher's Kansas Digest, rev. ed., Trial, § 312, and 1961 Supp. thereto p. 65; 9 West's Kansas Digest 1, Trial, § 359 (2), and 1962 Cum. Pocket Part thereto p. 130.

A recent expression of the cardinal rule followed by this court is to be found in *Epple v. Kress & Co.*, 187 Kan. 452, 357 P. 2d 828, where it was said:

"A general verdict imports a finding upon all issues in the case not inconsistent with the special findings. Special findings are to be construed liberally with a view to ascertaining the intention of the jury, and are to be given the meaning intended even though unskillfully expressed, and liberality of construction should be indulged in order to avoid inconsistency between the findings and the verdict and to uphold the verdict." (Syl. ¶ 1.)

See, also, 5 Hatcher's Kansas Digest, rev. ed., Trial, § 306, and 1961 Supp. thereto p. 65; 9 West's Kansas Digest 1, Trial, § 365 (2), and 1962 Cum. Pocket Part thereto pp. 132-133.

In *Isle v. Kaw Transport Co.*, 159 Kan. 110, 152 P. 2d 827, it was said:

"It is true a finding by the jury that defendant was guilty of negligence in a certain particular amounts to a finding that it was not guilty of other negligence charged. There is another rule to the effect that one answer to a special question may acquit of negligence and another may find defendant negligent. Furthermore where several questions are submitted to a jury, the answers to all of them will be construed together, and where one construction leads to a conclusion that the answers to the special questions are consistent with the general verdict and another that the questions are inconsistent with it, the former will be adopted. See *Sams v. Commercial Standard Ins. Co.*, 157 Kan. 278, 139 P.

2d 859, and cases therein cited. Juries have the right to apply their own common sense and general knowledge." (p. 118.)

I would affirm the judgment of the district court.

WERTZ and JACKSON, JJ., join in the foregoing dissenting opinion.

SCHROEDER, J., concurring: I am in agreement with the court's opinion, but under the circumstances feel compelled to make an additional observation. To support the trial court's decision, and the plaintiff's position on appeal, one must *assume* from the answer of the jury to special question No. 2 that had the sensitivity test been read it would have indicated a *positive reaction*. But this is inconsistent with the legal import of the answer to question No. 1— *a specific finding that the reaction was negative.*

The plaintiff's case was tried on the theory the sensitivity test indicated a positive reaction. This was the vital issue in the case. A specific finding that the reaction to the sensitivity test was negative *repels the assumption* that had the sensitivity test been read it would have indicated a positive reaction. The specific finding of the jury that the reaction was negative is therefore inconsistent with the general verdict. Under these circumstances, the special finding controls and the general verdict for the plaintiff cannot stand.

PRICE, J., joins in the foregoing concurring opinion.